UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————

No. 11 Civ. 4068 (RJS)

———————————

ROBERT SHEMIAN,

Lead Plaintiff,

VERSUS

RESEARCH IN MOTION LIMITED, *et al.*,

Defendants.

———————————

MEMORANDUM AND ORDER
March 28, 2013

———————————

RICHARD J. SULLIVAN, District Judge:

Lead Plaintiff Robert Shemian ("Plaintiff") brings this putative class action lawsuit against Defendants Research In Motion Limited ("RIM"), a Canadian mobile technology manufacturer and producer of the Blackberry smartphone, and three of its officers, Brian Bidulka ("Bidulka"), James Balsillie ("Balsillie"), and Mihalis Michael Lazaridis ("Lazaridis") ("Individual Defendants," collectively with RIM, "Defendants"). Plaintiff alleges that Defendants engaged in a scheme to obscure the company's faltering market position as growing competition rapidly outpaced RIM's aging product line. Plaintiff asserts that this scheme caused injury to him and to all other purchasers of RIM stock during the period from December 16, 2010 through June 16, 2011 (the "Class Period"), in violation of section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b); Rule 10b–5, promulgated thereunder, 17 C.F.R. § 240.10b–5; and sections 20(a) and 20(b) of the Exchange Act, 15 U.S.C. §§ 78t(a)–(b).

Before the Court is Defendants' motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons that follow, Defendants' motion is granted.

I. BACKGROUND

A. Parties

Plaintiff purchased shares of RIM stock during the Class Period and brings this putative class action lawsuit on behalf of "all other purchasers of [RIM] securities listed on an American stock exchange . . .

and all other purchasers of RIM securities in the United States" during the Class Period. (Consolidated and Amended Complaint ("CAC") ¶¶ 1, 21.)[1]

Defendant RIM is a Canadian developer, manufacturer, and marketer of mobile communications technology, most notably the BlackBerry, whose stock is publicly traded on the NASDAQ Global Select Market and other exchanges, including, *inter alia*, the Chicago Board Options Exchange and the Toronto Stock Exchange. (*Id.* ¶ 3.) In operation since 1984, RIM is a "world leader in the mobile communications market." (*Id.* ¶ 55.) Not surprisingly, RIM derives the bulk of its earnings from mobile devices, bringing in 80.2% of its fiscal year 2011 revenue from BlackBerry wireless handsets, service, and software. (*Id.* ¶ 42.) To remain competitive in this "rapidly evolving" mobile device marketplace (*id.* ¶ 45), RIM faces significant pressure to introduce innovative products in line with Apple's iPhone and devices supporting Google's Android platform (*id.* ¶¶ 43–47). However, it is widely acknowledged that RIM has failed to do so, prompting a raft of analyst downgrades and markedly depressed stock value during the Class Period. (*Id.* ¶¶ 12–13, 15, 48, 84–88, 106–10, 121–25.)

The Individual Defendants, Balsillie, Lazaridis, and Bidulka, were all officers of RIM during the relevant time period. (*Id.*

---

[1] The facts are taken from the CAC, as well as the documents attached to the CAC, statements or documents incorporated into the CAC by reference, legally required public disclosure documents filed with the Securities and Exchange Commission ("SEC"), and documents upon which Plaintiff relied in bringing the suit. *See Wilson v. Merrill Lynch & Co., Inc.*, 671 F.3d 120, 123 (2d Cir. 2011); *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). In ruling on the instant motion, the Court also considered Defendants' Memorandum of Law ("Defs.' Mem."), Plaintiff's Opposition ("Pl.'s Opp."), and Defendants' Reply ("Defs.' Rep.").

¶¶ 23–25.) Balsillie was a co-Chief Executive Officer of RIM and a co-Chairman of its Board of Directors. (*Id.* ¶ 23.) Lazaridis, a founder of the company, was at the time RIM's President, a Co-Chief Executive Officer, and a Co-Chairman of the Board. (*Id.* ¶ 24.) Bidulka was RIM's Chief Financial Officer. (*Id.* ¶ 25.) Together, Balsillie and Lazardis "tightly controlled the company's destiny, with few above or below them wielding influence." (*Id.* ¶ 140 (quoting a member of the Board).) Further, Balsillie made statements on the conference calls and in the press releases, and signed certifications to the SEC filings at issue in this action. (*Id.* ¶ 23.) Lazaridis also signed the certifications and was quoted in the press releases, while Bidulka made statements on the calls and signed the certifications, as well as the filings themselves. (*Id.* ¶¶ 24–25.)

## B. Facts

In the winter of 2010, RIM was enjoying a period of remarkable prosperity: the company had reported record shipments of its BlackBerry smartphone, 40% revenue growth, a 58% increase in earnings per share, a $446 million increase in cash on hand, and 5.1 million new Blackberry subscribers, bringing its total subscriber base to approximately 55 million. (*Id.* ¶ 55.) At the same time, RIM stated that its financial outlook was sound: the company was at work on a new operating system, QNX, which promised to rival Android (*see id.* ¶ 9), and its first-ever tablet, the PlayBook, which was touted by the company as "the most significant development for RIM since the launch of the first BlackBerry" (*id.* ¶ 79).

However, Plaintiff alleges that RIM's reality was in fact bleak. Instead of signaling future growth, winter 2010 marked a short-lived peak of financial success. (*See*

*id.* ¶ 166.) From a high of $69.86 on February 11, 2011, RIM's stock plummeted to $27.25 at the end of the Class Period on June 17, 2011. (*Id.*) The plunge followed a series of setbacks for RIM, including slowed sales on its aging product line, delays in releasing QNX, and a rushed introduction of the PlayBook that was marred by the tablet's glitches and lack of basic features. (*Id.* ¶¶ 84, 94–97, 107–08, 110, 112, 115–24.) Plaintiff alleges that these setbacks were knowable, and in fact known by Defendants, who nevertheless embarked on a scheme to issue materially false and misleading statements that lauded the company's condition and led investors to purchase RIM stock at inflated prices. (*Id.* ¶¶ 3–16, 31, 179–98.) That claim, and the characterization of Defendants' statements, are at the heart of this action.

### 1.  The Alleged Scheme

Plaintiff alleges that, by the start of the Class Period, RIM's product line was rapidly losing market share. (*Id.* ¶ 43.) The media and market agreed that RIM's failure to introduce new and innovative products was at the root of this decline. (*Id.* ¶¶ 43, 47.) RIM acknowledged that key to its survival was the company's "ability to . . . develop and introduce new products and services . . . on a timely basis at competitive prices." (*Id.* ¶ 44 (quoting March 29, 2011 Form 40-F).) Nevertheless, in what Plaintiff alleges to be an admission of RIM's torpor, the company announced in September 2010 that it would stop releasing metrics of its competitive success: specifically, the average selling price ("ASP") of its devices and net additions to its subscriber base. (*Id.* ¶¶ 49–50.)

At the same time, RIM allegedly began to suffer from routine product delays. (*Id.* ¶ 143.) Relying on confidential informants,

Plaintiff asserts that these delays became rampant, such that products were either released late or rushed to the market unfinished.[2] (*Id.* ¶¶ 143–47, 149–53.) As a result, confidential informant ("CI") #1 states that RIM's operating ethos during the Class Period was "launch it and then fix it," a reflection of the company's tendency to "over-promise[] and under-deliver[]." (*Id.* ¶ 142.) While this business plan sufficed when RIM led the market for high-end handheld devices, once competition emerged, carriers balked and RIM's sales began to suffer. (*Id.* ¶¶ 142, 144.)

Prospects thus flagging, RIM attempted to reenergize its subscriber base with QNX and the PlayBook. However, Plaintiff alleges that these products also fell victim to RIM's lax production schedule. According to CIs #4 and #5, it was widely known within RIM that QNX was behind schedule. (*Id.* ¶ 146.) CI #4, a Senior Software Engineer who left RIM shortly before the beginning of the Class Period, states that in 2010 RIM was not taking action "consistent with the release of a new operating system." (*Id.*) And CI #5, a Partner Manager, reports that QNX missed its first release date of December 2010 and that, by the second target date in 2011, carriers "did not trust RIM." (*Id.*)

The PlayBook suffered similarly – however, instead of missing a third target date, RIM allegedly rushed PlayBook to the market prematurely. (*Id.* ¶ 58(d); *see also* ¶¶ 149–51.) As a result, RIM launched its tablet "without built-in cellular data, email,

---

[2] Defendants argue that statements from confidential informants who left RIM prior to the Class Period should be disregarded. However, pre-class facts, just like post-class facts, may be considered if relevant. *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001).

contacts, a calendar and other core features, which were already offered on other competing devices." (*Id.* ¶ 58(d).) The PlayBook would only run approximately 3,000 applications compared with BlackBerry's 27,000 and the iPad's 65,000. (*Id.*) The PlayBook's browser and software were prone to crashing, and about 1,000 of the tablets would be recalled due to software problems that prevented use. (*Id.*) Finally, despite RIM's talk of exciting launches with Verizon, Sprint was the only carrier for the PlayBook. (*Id.*) Perhaps jolted by critical reviews of the PlayBook's capabilities, RIM acquired two companies whose technologies could enhance RIM's application development and calendaring software. (*Id.* ¶ 156.) However, that intervention would prove too late. Just eight months after the PlayBook's launch, the tablets that had retailed for $500 sold for only $200 – mirroring RIM stock's contemporaneous fall. (*Id.* ¶ 132.)

Plaintiff alleges that this decline was foreseeable and that, as a result, RIM was obligated by the federal securities laws to disclose such "known trends or uncertainties" to investors. (*Id.* ¶ 51 (citing Item 303, 17 C.F.R. § 229.303(a)(3)(ii)).) Specifically, Plaintiff charges that Defendants were obligated to reveal "material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition." (*Id.* ¶ 52.) Instead, Plaintiff claims that Defendants relied on reports of past profit to make misleading predictions of future gains. These predictions were deceptive, Plaintiff alleges, because Defendants were required to disclose that RIM's aging product line, often unsalable inventory, and lack of any new devices – much less a "blockbuster" product to compete with Apple and Android

– would drive RIM's sales down. (*Id.* ¶¶ 58(a)–(f).) Plaintiff asserts that Defendants were also required to disclose allegedly damaging resource constraints caused by RIM's simultaneous work on new smartphones, QNX, and the PlayBook, which disrupted RIM's production ability, resulting in decreased shipments of BlackBerry smartphones and lower profit from the older devices on the market. (*Id.*)

In addition, Plaintiff claims that Defendants knew or should have known that QNX and the PlayBook could not save RIM from this tailspin. As an initial matter, Plaintiff posits that QNX was, unbeknownst to investors, too delayed to aid fiscal year 2012 profits. While RIM promised delivery of QNX in 2011, the operating system would not be available on RIM handheld devices until 2012. (*Id.*) Further, though RIM pinned its future on the PlayBook, Plaintiff alleges that RIM was "scrambling to get the PlayBook to the market." (*Id.* ¶ 58(d).) As a result of the tablet's shortcomings, allegedly stemming from its premature launch, the PlayBook was a bitter disappointment to consumers and commentators, and significantly underperformed relative to RIM's projections. (*Id.* ¶¶ 94–97; 132.)

Finally, Plaintiff finds it implausible that the Individual Defendants were unaware of this fiscal precipice given their central roles at the company – or, if they were, that their statements were thus so lacking in factual basis as to be reckless. Accordingly, Plaintiff states that "Defendants are caught between Scylla and Charybdis: either they knew about RIM's problems and failed to disclose them, or they did not bother informing themselves of easily available information before speaking." (Pl.'s Opp. 26.) The Individual Defendants' alleged knowledge, together with their financial

incentives for success and desire to close on PlayBook-related acquisitions, purportedly paved the way for Defendants' fraud. (CAC ¶¶ 156–61.)[3]

### 2. The Allegedly False and Misleading Statements Issued During the Class Period

Plaintiff alleges that Defendants made several false or misleading statements in press releases, during conference calls, and on SEC reports that were intended to obscure, or had the effect of obscuring, RIM's souring fundamentals. These statements continued from December 16, 2010 until June 17, 2011, when Defendants allegedly could no longer conceal the damage that delays, outdated products, and the botched PlayBook launch caused to RIM's bottom line. The statements at issue are detailed below.

### a. December 16, 2010 Press Release and Conference Call

On the first day of the Class Period, Defendants issued a press release ("the December 2010 release") and convened a conference call ("the December 2010 call") to announce RIM's third quarter results for the three months ending on November 27, 2010. (*Id.* ¶¶ 55–61.) The press release reported record shipments of BlackBerry devices, huge gains in the BlackBerry subscriber base, and a healthy 40% growth

in profit. The press release also contained, in relevant part, the statements:

> RIM's business continues to grow and diversify as BlackBerry adoption accelerates in markets around the world. (*Id.* ¶¶ 55–56(a) (quoting Balsillie).)

> With strong results and momentum from our recent product introductions, as well as growing excitement from our partners and customers around upcoming smartphone, tablet, software and service offerings, we are setting the stage for continuing success. (*Id.* ¶¶ 55, 56(b) (quoting Balsillie).)

> Revenue for the fourth quarter of fiscal 2011 ending February 26, 2011 is expected to be in the range of $5.5–$5.7 billion. Gross margin percentage for the fourth quarter is expected to be similar to third quarter levels. Earnings per share for the fourth quarter are expected to be in the range of $1.74–$1.80 per share diluted. (*Id.* ¶¶ 55, 56(d).)

Defendants made similarly positive reports on the conference call, in which Balsillie and Bidulka participated. (*Id.* ¶ 57.) Specifically, Balsillie announced:

> RIM is pleased to report a record third quarter . . . and strong outlook for the fourth quarter. This is the sixth consecutive quarter that RIM has reported record shipments. International markets continue to adopt BlackBerry in record numbers. . . .

> Our relationship with Verizon remains strong and we look forward

---

[3] Plaintiff also cites a settlement between Lazaridis and Balsillie and the SEC as evidence of Defendants' "propensity to engage in improper business conduct." (*Id.* ¶ 162.) However, the settlement involved a non-scienter based crime and did not require either Individual Defendant to admit guilt. (*Id.*) Accordingly, this "reference[] to [a] preliminary step[] in . . . [an] administrative proceeding[] that did not result in an adjudication on the merits or legal or permissible findings of fact [is], as a matter of law, immaterial under Rule 12(f)." *In re Platinum and Palladium Commodities Litig.*, 828 F. Supp. 2d 588, 593 (S.D.N.Y. 2011).

to rolling out a number of exciting new products and services with this partner over the coming year. . . . Initial feedback from our customers and partners is overwhelmingly positive [regarding the PlayBook] . . . .

We look forward to rolling out products over the next year reflecting the addition of expertise from QNX . . . .

And so, yes, we have real differentiation and we have real opportunities for extension of the business in a whole bunch of ways. I mean, just the pent-up interest in the Playbook is really overwhelming. . . . So I think we're laying in the pieces here to sustain really exciting growth for a long, long, long time. . . .

I feel very, very good about U.S. . . . .

[T]he product roadmap looks great . . . .

[B]ut we feel very, very good about the future, but it's never been busier. . . .

Well, I mean, we're pleased the business is growing fast and that we met and exceeded our guidance and that we see a very strong quarter to win right now. . . .

[Y]es, I feel very, very good about where we are in the U.S. – I feel very, very good about where we are around the world. . . .

But do I think we're in a position to really take where we are and extend it further in a sort of sustained basis in the U.S. and abroad? In my view, without a doubt, without a doubt. . . . So, I think the PlayBook clearly sets the bar way higher on performance. And you're going to see more. I think the enterprise stuff, we're seriously extending. I think the BlackBerry's still number one in social collaboration. And I think with the PlayBook and that environment, we're going to set the new standard on performance and tools, very powerful tools. So, and we're growing very, very fast. So, that's a lot. . . .

But I think we're just well ahead on the PlayBook, well ahead internationally, and extending very, very well.

(*Id.* (quoting Balsillie).) Bidulka added, "we are comfortable with the inventory levels across most channels given the demand outlook." (*Id.* ¶ 59 (quoting Bidulka).) And non-party Edel Ebbs ("Ebbs"), RIM's Vice President of Investor Relations, ended the call by stating that RIM expected "to ship between 14.5 million and 15 million units in the fourth quarter of fiscal" 2011 as a result of "demand throughout the holiday season, new product launches . . . and ongoing strong demand for existing products." (*Id.* ¶ 60.)

Significantly, the press release and conference call both contained cautionary language not quoted in the CAC. Specifically, the language warned that the statements in the release and call were "forward-looking" and that:

[m]any factors could cause RIM's actual results, performance or achievements to differ materially from those expressed or implied by

6

the forward-looking statements, including, without limitation: . . . RIM's ability to enhance current products and develop new products and services; risks related to delays in new product launches; risks related to competition; RIM's reliance on carrier partners; . . . [and] risks related to RIM's ability to manage its production facilities.

(Decl. of Scott D. Musoff, dated June 4, 2012, Doc. No. 42 ("Musoff Decl."), Exs. G, J.)  The release and call also referenced over twenty pages of cautionary language in RIM's SEC filings.  (*Id.* Exs. E, G, J.)

b.  December 17, 2010 Form 6-K SEC Filing

On December 17, 2010, RIM filed its Form 6-K with the SEC for the filing period ending on November 27, 2010.  (CAC ¶ 62.) The Form was signed by Bidulka, reiterated RIM's third-quarter results, and contained certifications signed by Balsillie, Lazaridis, and Bidulka that the filing did not contain any material misstatements or omissions. (*Id.*)  With respect to RIM's gross profit margin, the Form 6-K also reported that RIM "expects consolidated gross margin in the fourth quarter of fiscal 2011 to be similar to levels experienced in the third quarter of fiscal 2011."  (*Id.* ¶ 63.)

As with the press release and conference call, the Form 6-K contained cautionary language advising that the filing's "forward-looking statements . . . relating to," *inter alia*, RIM's "new product introductions," "estimates regarding revenue sensitivity for the effect of a change in average selling price," and "estimates regarding gross margin" could materially depart from actual outcomes based on several factors, including product delays and introductions,

competition, relationships with carriers, defects in products, and the difficulty of forecasting quarterly results and changes in subscriber base.  (Musoff Decl. Ex. E.)

Following these reports, *IT World: Tech Business Today* wrote that RIM's "third quarter report may not quell long-term concerns about its dwindling smartphone market share, but it certainly shows a company currently in a strong financial position."  (*See* CAC ¶ 65.[4])

c.  January 6, 2011 Press Release

On January 6, 2011, RIM issued a press release ("the January 2011 release") announcing the PlayBook's appearance at the upcoming Consumer Electronics Show and stating in part:

With industry leading performance, uncompromised web browsing, true multitasking, HD multimedia, advanced security features, out-of-the-box enterprise support and a robust development platform, the BlackBerry PlayBook is the world's first professional-grade tablet. "Initial feedback about the BlackBerry PlayBook has been outstanding," said [Lazaridis].  "Our strategic decision to invest in groundbreaking performance, web fidelity and an open web based development environment is resonating extremely well with customers and developers."

---

[4] In the CAC, Plaintiff surgically excerpted this quote to imply that the market was unaware of the concerns, raised elsewhere in the CAC, about RIM's "long-term" prospects.  (*See* CAC at ¶ 65.)  There it reads: "Research in Motion's third-quarter report . . . certainly shows a company currently in a strong financial position."  (*Id.*)

(*Id.* ¶ 66.)   In language not quoted in the CAC, the release further stated that the PlayBook will have "WiFi . . . connectivity." (Musoff Decl. Ex. M.)  Like the prior release, the January 2011 release contained language qualifying the statements as "forward-looking," warning of the potential for different outcomes, and incorporating the risk factors discussed in RIM's Form 40-F.  (*Id.*)

On February 18, 2011, RIM's stock increased to a Class Period high of $69.86. (*Id.* ¶¶ 8, 125, 166, 168.)

### d.  March 22, 2011 Press Release

On March 22, 2011, the Company issued a press release ("the March 22, 2011 release") in which Lazaridis described the PlayBook as "an amazing tablet that is already being widely praised as a multi-tasking powerhouse with an uncompromised web experience and an ultra-portable design." (*Id.* ¶ 68.)  In the press release, RIM announced both its plans to make the PlayBook available in more than 20,000 retail outlets in the United States and Canada, as well as the carriers it "currently expected" would sell the tablet, including AT&T, Sprint, and Verizon. (*Id.*; Musoff Decl. Ex. N.)   The press release also promoted the "high level of customer interest" in the tablet and stated the PlayBook's specifications.   (CAC ¶ 68.) The release concluded by noting that the "PlayBook with Wi-Fi will be available in three models and will feature a Manufacturer's Suggested Retail Price (MSRP) starting at $499 in the United States and Canada." (*Id.*)  Following its main text, the release stated the same cautionary language discussed above. (*Id.*)

### e.  March 24, 2011 Press Releases

RIM released a flurry of communications on March 24, 2011.  In the first, a press release ("the March 24, 2011 PlayBook release"), RIM pegged an April 19, 2011 launch for the PlayBook and explained the tablet's third-party application development process.   It also included the following statements highlighted by Plaintiff:

> The BlackBerry PlayBook is an amazing tablet.  The power that we have embedded creates one of the most compelling app experiences available in a mobile computing device today.   (*Id.* ¶ 70 (quoting Lazaridis).)

> "With a sharp focus on the multimedia experience, very powerful hardware, and fantastic games in the pipeline, the BlackBerry PlayBook has all the right ingredients to be a mainstream hit."    (*Id.* (quoting the general manager of a game developer).)

That day, RIM also announced its fourth-quarter results for the three months ending on February 26, 2011.  (*Id.* ¶ 72.)  In its press release announcing the results ("the March 24, 2011 fourth-quarter release"), RIM reported record device shipments, 33% revenue growth, and 47% earnings per share growth over 2010. (*Id.*)  Balsillie stated that RIM was "pleased to report record shipments and financial performance in fiscal 2011" and that

> [a]s we enter fiscal 2012, RIM is in an excellent position to benefit from the continuing convergence of the mobile communications and mobile computing markets.  We are laying a strong foundation for RIM's

expanding market opportunity through focused investments and we are extremely excited about our smartphone, tablet[,] and platform roadmaps.

(*Id.*) The release concluded by forecasting revenue for the first quarter of fiscal year 2012 "to be in the range of $5.2–$5.6 billion" and earnings per share "to be in the range of $1.47–$1.55 per share diluted." (*Id.*) The release admitted that, "[t]his guidance range reflects a mix shift in handset towards lower ASP products in the first quarter and an increased level of investment in Research and Development and Sales and Marketing related to our tablet and platform initiatives." (*Id.*) It concluded with the cautionary language discussed above. (Musoff Decl. Ex. K.)

Defendants also convened a conference call ("the March 24, 2011 call"), in which Balsillie and Bidulka participated. (*Id.* ¶ 74.) During the call, Defendants admitted that RIM's aging product line precluded growth in North America in the coming quarter. Specifically, Balsillie stated that "[g]iven the maturity of the BlackBerry product portfolio in this market we are not forecasting a near term improvement in North American growth in the first quarter." (*Id.*) Further, Ebbs pinned slowed demand and falling profit on the "long life" of the RIM line in the market. (*Id.* ¶ 75.) But Ebbs assured listeners that "we're expecting a pretty big step-up in growth, and as we launch these new products, that would be the primary driver." (*Id.* ¶ 83.) Balsillie attempted to tamp down concerns as well, highlighting RIM's strong fiscal year, particularly internationally, and stating that "[w]e don't see the Q1 decline in sequential earnings per share as a beginning of a trend but rather as a period of transition." (*Id.* ¶ 76.)

Balsillie focused on RIM's new products as a catalyst for this transition, promoting RIM's "outstanding set of new product introduction" and identifying the PlayBook as "the most significant development for RIM since . . . the launch of the first BlackBerry device." (*Id.* ¶ 79.) He continued:

> [W]e feel fantastic about the future of the company and its prospects. I'll put it in a simple word: It's transition, . . . and that's why you see the volume of units being what they are. But we still are forecasting to grow substantially this year, we're coming off another great year of growth and we're investing very heavily . . . .
>
> When you see the platforms, when you see the performance, you'll see why we're so bullish on the company and its current prospects for this fiscal year. . . .
>
> We feel [PlayBook] is a winner. And the most important thing about the product is get it out as soon as possible but make sure it's stable. And that's the tension. We believe it's stable by April 19, it's got a great over-the-air utility for upgrading, it's got so many things that just future-proof it, you got to get it done and get it out and make sure it's stable, and that's why we're being very prudent on the timing. But it's a winner. It's such a winner.

(*Id.*) Balsillie also summarized the release's financial projections, admitting that the dimmer outlook reflected "a shift in the mix of handset towards lower ASP entry-level devices." (*Id.* ¶ 81.) Despite these warning signs, Basillie was "confident that fiscal

9

2012 [would] be another strong year of revenue and earnings growth for RIM." (*Id.*)

Following these communications, numerous analysts downgraded RIM stock. Of note, Deutsche Bank downgraded shares from "hold" to "sell," in part because "[w]ith no QNX on handsets until [2012], we think RIM will likely continue to lose share to Android smartphones whose prices are rapidly falling." (*Id.* ¶ 84.) And Bank of America/Merrill Lynch downgraded RIM from "buy" to "hold," stating:

> We basically disagree with almost everything management stated on their call and believe margins will continue to decline; management's expectations for new product sales are too high; portfolio will likely remain poor until 2012; and finally, [fiscal year 2012 earnings per share] guidance is too aggressive . . . . Management tends to over-promise, but we have heard about exciting products for the past two years, while the reality is leaning more towards sub-par products that are selling poorly and the only ray of light is in places where RIM competes on price, in the low end market.

(*Id.* ¶ 86.) Finally, Bernstein Research maintained its "underweight" rating, stating that "[m]anagement recognized BlackBerry was suffering from competition in the U.S. for the first time last night." (*Id.* ¶ 87.) In the wake of these developments, RIM stock dropped "on heavy trading volume" from $64.09 on March 24, 2011 to $56.89 on March 25, 2011. (*Id.* ¶¶ 10, 88, 166.)

#### f. March 29, 2011 Form 40–F

On March 29, 2011, Defendants filed their Annual Information Form ("the March 29 Form 40–F") with the SEC, which included certifications signed by the Individual Defendants stating that the form did not contain any material misrepresentations. (*Id.* ¶ 89.) Bidulka signed the form. (*Id.*) Defendants repeated the lowered projections for the first quarter, taking into account both lower expected ASP and anticipated product launches. (*Id.* ¶ 90.) RIM also forecast that its supply would continue to meet demand. (*Id.* ¶ 90.) The filing contained over twenty pages of cautionary language, similar to that described above. (Musoff Decl. Ex. C.)

#### g. April 28, 2011 Press Release and Conference Call

The PlayBook's first reviews appeared on April 13, 2011. The *Wall Street Journal* lambasted the device's lack of core features and declined to recommend the tablet over its competitors. (*Id.* ¶ 94.) The *New York Times* praised the PlayBook's hardware but faulted its "lacking" software and dearth of applications. (*Id.* ¶ 95.) And others noted the device's tendency to crash and the vulnerability of its vaunted security. (*Id.* ¶¶ 96–97, 131.)

Shortly thereafter, on April 28, 2011, RIM issued lowered first quarter guidance. (*Id.* ¶ 98.) In its press release ("the April 2011 release"), RIM lowered earnings per share estimates from $1.47–$1.55 to $1.30–$1.37, blaming slowing shipments and a shift toward lower-priced devices. (*Id.*) RIM also forecast revenue "slightly below" the previously estimated $5.2–5.6 billion. (*Id.*) However, RIM was resolute that it would hit its fiscal year diluted earnings targets on strong revenue in the third and

10

fourth quarters due to new devices and "prudent cost management." (*Id.*)

On a call convened that day ("the April 2011 call"), Bidulka admitted that the new estimates stemmed from "lower than expected sell through" due to the "age of the BlackBerry smartphone portfolio currently in market [and] delays in new product introductions." (*Id.* ¶ 100.) However, Bidulka insisted that "we're in a great position and we're going to work hard and execute into it." (*Id.* ¶ 102.) Basillie concurred that RIM's new product launches, including a new handheld device and the PlayBook, kept the company in a strong position. (*Id.* ¶ 103.) Basillie continued, "if I had some sense that something was shifting or slowing down I'd comment, but I think we're in a time of rapid transition and I like our position, I love our position." (*Id.* ¶ 104.)

Like earlier releases and calls, both contained cautionary language warning that the statements were forward-looking and advising that actual outcomes could materially differ from those projected. (Musoff Decl. Exs. I, L.)

On this news, RIM's stock fell on "unusually heavy trading volume" from $56.59 on April 28, 2011 to $48.65 on April 29, 2011. (*Id.* ¶¶ 106, 166.) As reported in the *Wall Street Journal*, "after Thursday's announcement, even some of the most optimistic RIM watchers have begun to question whether the company has done enough. 'We really want to believe, but . . . last night's warning caps what has been a string of strategic and execution missteps.'" (*Id.* ¶ 107 (quoting a Wall Street analyst).)

### 3. RIM's Subsequent Disclosures and the Full Extent of Its Losses

RIM took steps to stanch the bleeding – unveiling new BlackBerry smartphones (*id.* ¶ 111) and launching the PlayBook in a number of new markets (*id.* ¶ 113) – but its precipitous decline in value continued. On June 16, 2011, RIM announced its first quarter results, with $4.9 billion in revenue – shy of the $5.2–$5.6 billion forecast in the revised guidance – and $1.33 earnings per share – within the $1.30–$1.37 range set forth in the April revision. (*Id.* ¶ 115.) RIM also indicated that it anticipated a slower than expected second quarter and announced impending layoffs. (*Id.*) In the company's conference call, Balsillie blamed the disappointing earnings on the already disclosed sinking demand and lower-priced products. (*Id.* ¶ 116.) However, Balsillie also admitted that new product delays had "excluded [RIM] from some of the back-to-school programs we had expected to be part of" and that the PlayBook launch "did not go as smoothly as [RIM] had planned." (*Id.*) Lazaridis acknowledged that late-stage handset redesigns had hampered RIM's ability to timely launch new products. (*Id.* ¶ 117.) And Ebbs stated that new BlackBerry models would thus not be shipped until later in the quarter. (*Id.* ¶ 118.) RIM's stock tumbled "on enormous volume" from a close of $35.33 on June 16, 2011 to $27.75 at the close of June 17, 2011. (*Id.* ¶ 119.)

Following the close of the Class Period, RIM shed 2,000 jobs, Lazaridis was demoted, Balsillie resigned, and the price of a PlayBook sank from $500 to $200, forcing a $485 million write-down on RIM's PlayBook inventory. (*Id.* ¶¶ 126, 129, 131–33.) Plaintiff asserts that these developments "reveal what Defendants knew, or blindly disregarded, about RIM['s

deteriorating condition] during the Class Period." (*Id.* ¶ 134.)

### C.  Procedural History

The initial Complaint against Defendants was filed on June 15, 2011. Thereafter, two additional putative class actions were filed in this district.[5] By Order dated January 5, 2012, the Court appointed the lead plaintiff and counsel, and consolidated the cases under the caption "*In re Research in Motion Limited Securities Litigation.*" (Doc. No. 35.) On April 5, 2012, Plaintiff filed the CAC alleging violations of sections 10(b), 20(a), and 20(b) of the Exchange Act, as well as Rule 10b–5. (Doc. No. 38.) Defendants filed their motion to dismiss and supporting memorandum of law on June 4, 2012. (Doc. Nos. 40, 41, 42.) The motion was fully briefed on September 5, 2012, and the Court heard argument on October 25, 2012. (Doc. No. 46.)

## II.  LEGAL STANDARD

### A.  Motion to Dismiss

In reviewing a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a Court must accept as true all factual allegations in the complaint and draw all reasonable inferences in favor of the plaintiff. *ATSI Commc'ns, Inc.*, 493 F.3d at 98. To survive a Rule 12(b)(6) motion to dismiss, a complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows

the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). By contrast, a pleading that "offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555). If the plaintiff "ha[s] not nudged [his] claims across the line from conceivable to plausible, [his] complaint must be dismissed." *Twombly*, 550 U.S. at 570.

### B.  Securities Fraud

Securities fraud claims are subject to heightened pleading standards under Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act (the "PSLRA"), 15 U.S.C. § 78u–4(b). *ATSI Commc'ns, Inc.*, 493 F.3d at 99. To satisfy Rule 9(b), a claim of fraud must "state with particularity the circumstances constituting fraud." Fed.R.Civ.P. 9(b). This standard requires that the complaint "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *ATSI Commc'ns, Inc.*, 493 F.3d at 99 (citation omitted). "Allegations that are conclusory or unsupported by factual assertions are insufficient." *Id.*

To satisfy the PSLRA, a plaintiff claiming securities fraud must "'specify' each misleading statement"; "set forth the facts 'on which [a] belief' that a statement is misleading was 'formed'"; and "'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005) (quoting 15 U.S.C. § 78u–4(b)). Thus, while a court typically draws all reasonable inferences in a plaintiff's favor, the PSLRA

---

[5] The Complaint in *Demarkis v. Research In Motion Limited*, No. 11 Civ. 4560 (RJS), was filed on July 5, 2011, and the Complaint in *McNeal et al v. Research In Motion Limited*, No. 11 Civ. 5472 (RJS), was filed on August 5, 2011.

"establishes a more stringent rule for inferences involving scienter because the [statute] requires particular allegations giving rise to a strong inference of scienter." *ECA, Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009).

### III. DISCUSSION

Defendants seek an order dismissing Plaintiff's claims on the grounds that Plaintiff failed to (1) raise a strong inference of scienter, (2) allege any actionable misstatements or omissions, or (3) plead control person liability as to the Individual Defendants. For the reasons set forth below, Defendants' motion to dismiss is granted.

### A. Section 10(b) Claims

Plaintiff's principal claim is brought pursuant to Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder. Rule 10b-5 provides, in relevant part, that it is unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b). To state a claim for securities fraud under Section 10(b) and Rule 10b-5, a plaintiff must adequately plead: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 157 (2008). Defendants argue that Plaintiff has failed to plead scienter and any material

misrepresentations or omissions.[6] The Court agrees on both points.

#### 1. Scienter

Under the PSLRA, a well-pleaded securities fraud complaint must "state with particularity facts giving rise to a *strong* inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2) (emphasis added). "The requisite state of mind in a section 10(b) and Rule 10b-5 action is an intent 'to deceive, manipulate, or defraud.'" *ECA*, 553 F.3d at 198 (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.* 551 U.S. 308, 313 (2007)). Recklessness, defined as "an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it," *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009) (internal quotation marks and alterations omitted), is also a "sufficiently culpable mental state for securities fraud" in the Second Circuit, *ECA*, 553 F.3d at 198.

A strong inference of scienter "must be more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314. In this

---

[6] Defendants make a reliance argument to the extent they assert that Plaintiff based his claims only on his purchase of RIM common stock traded on NASDAQ, and thus argue that "Plaintiff cannot plead reliance on Defendants' allegedly false and misleading statements in regards to the purchase of any *other* RIM security." (*See* Def.'s Mem. 29 (emphasis added).) However, Plaintiff purchased both RIM stock and options (*see* Doc. No. 37), and stated in the CAC that "RIM's options were traded on American exchanges, including the Chicago Board Options Exchange, which are highly-efficient, open, developed, and automated markets, free of manipulation" (CAC ¶ 37(a)). Thus, Defendants' reliance argument fails.

Circuit, the requisite strong inference of scienter "can be established by alleging facts to show either (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." *ECA*, 553 F.3d at 198; *accord ATSI Commc'ns*, 493 F.3d at 99. Plaintiff has failed to plead either basis.

### a. Motive and Opportunity

The Individual Defendants were high-level executives at RIM at all relevant times. Thus, their opportunity to commit fraud is uncontested, and the Court will only consider whether Plaintiff has adequately pled their motive to do so. *See In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 349 (S.D.N.Y. 2011).

In order to raise a strong inference of scienter through motive to defraud, the plaintiff must allege that the defendant "benefitted in some concrete and personal way from the purported fraud." *ECA*, 553 F.3d at 198. However, "it is not sufficient to allege goals that are 'possessed by virtually all corporate insiders,' such as the desire to maintain a high credit rating for the corporation or otherwise sustain the appearance of corporate profitability or the success of an investment, or the desire to maintain a high stock price in order to increase executive compensation." *S. Cherry*, 573 F.3d at 109. By contrast, insider trading is considered a classic example of a "concrete and personal" benefit that suffices to plead motive to commit securities fraud. *See, e.g.*, *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 74 (2d Cir. 2001).

Plaintiff alleges that Defendants had two motives to commit securities fraud: (1) for the purpose of obtaining "various financial incentives," including an increase in annual incentive awards, salary, and bonuses (CAC ¶¶ 157–61), and (2) to enable the acquisition of two technology companies for cash consideration during the Class Period (CAC ¶ 156).[7] Both allegations are unavailing. First, "[g]eneral allegations that the [D]efendants acted in their economic self-interest are not enough." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 170 (2d Cir. 2000). Thus, a complaint does not raise a strong inference of scienter by alleging "[m]otives that are generally possessed by most corporate directors and officers." *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001). Accordingly, the Individual Defendants' alleged motive to increase their compensation – a motive arguably held by all corporate executives – cannot give rise to a strong inference of scienter. *See S. Cherry*, 573 F.3d at 109.

Second, though "the artificial inflation of stock prices in order to acquire another company may, in some circumstances, be sufficient for scienter[,] . . . the inquiry is an extremely contextual one." *Wachovia*, 753 F. Supp. 2d at 350. Here, Plaintiff alleges that the Individual Defendants inflated RIM stock value to enable the purchase of two technology companies whose software could be used to address deficiencies in the PlayBook's application and calendaring

---

[7] Plaintiff alleges for the first time in his opposition brief that the Individual Defendants were motivated by a desire to "maintain their positions in the [c]ompany that they had built." (Pl.'s Opp. at 28.) However, while other circuits may find such an allegation sufficient to plead motive, this Circuit has held that it is insufficient to raise a strong inference of scienter. *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994) ("If motive could be pleaded by alleging the defendant's desire for continued employment . . . the required showing of motive and opportunity would be no realistic check on aspersions of fraud, and mere misguided optimism would become actionable under the securities laws.").

features. (CAC ¶ 156; Pl.'s Opp. 27). However, the implausibility of this motive defeats the allegation. RIM acquired the companies on March 25 and April 26, 2011, respectively, and the PlayBook was released on April 19, 2011. It is difficult to believe that Defendants schemed to mislead investors as to the market-readiness of the PlayBook in order to inflate RIM's stock value so as to acquire technology to fix the PlayBook when the PlayBook and its failings would be public by the time any such technology could be put to use. *See Kalnit*, 264 F.3d at 140 (dismissing counterintuitive allegation of motive as "nonsensical"); *Wachovia*, 753 F. Supp. 2d at 350 (dismissing allegation of motive based on the improbable timeline alleged). The plausibility of this alleged motive is further undercut by the fact that the companies cost $27 million, or less than 1% of RIM's approximately $2 billion cash on hand – a mere sliver of RIM's losses once PlayBook's shortcomings were inevitably disclosed amidst the acquisitions. (*See* Defs.' Mem. 14 n.7; Musoff Decl. Ex. F.)

More to the point, the CAC states only that the companies were acquired. (*See* CAC ¶ 156.) It was not until his filing of opposition papers in connection with this motion that Plaintiff first drew a connection between the acquisitions and an alleged motive to enhance the PlayBook. (*See* Pl.'s Opp. 27); *Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998) (declining to consider claim raised for the first time in opposition to motion to dismiss because "a party is not entitled to amend its complaint through statements made in motion papers"). Thus, Plaintiff "ha[s] alleged only 'a generalized desire to achieve a lucrative acquisition proposal,' which fails to establish the requisite scienter." *Wachovia*, 753 F. Supp. 2d at 350 (quoting *ECA*, 553 F.3d at 201); *see also Bd. of Trustees of the*

*City of Fort Lauderdale Gen. Emps.' Ret. Sys. v. Mechel OAO*, 811 F. Supp. 2d 853, 867 (S.D.N.Y. 2011) (dismissing allegation of motive where plaintiff failed to "allege a unique connection between the fraud and the acquisition[s]").

In sum, "[i]t is hard to see what benefits accrue[d to Defendants] from a short respite from an inevitable day of reckoning." *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994). Plaintiff has failed to identify any "concrete and personal" benefit that would have motivated the Individual Defendants to engage in securities fraud. *See ECA*, 553 F.3d at 198. Thus, Plaintiff cannot rely on allegations of motive and opportunity to support his claim.

b. Conscious Misbehavior or Recklessness

Of course, Plaintiff is correct that he "need not allege motive to successfully state a claim" for securities fraud. (Pl.'s Opp. 27 (citing *Tellabs*, 551 U.S. at 325).) Instead, where motive is absent, a plaintiff may also raise a strong inference of scienter by showing circumstantial evidence of conscious misbehavior or recklessness, although "the strength of the circumstantial allegations must be correspondingly greater." *Kalnit*, 264 F.3d at 142. Conscious misbehavior "encompasses deliberate illegal behavior, such as securities trading by insiders privy to undisclosed and material information, or knowing sale of a company's stock at an unwarranted discount." *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000) (internal citations omitted). Plaintiff has alleged no facts to support an inference that Defendants engaged in such illegal or untoward behavior. Thus, the Court will look only to whether Plaintiff has adequately pled recklessness.

In the context of securities fraud, a "reckless disregard for the truth" means "conscious recklessness," defined as "a state of mind approximating actual intent, and not merely a heightened form of negligence." *S. Cherry*, 573 F.3d at 109. Recklessness is sufficiently pled where a plaintiff specifically alleges that defendants either (1) knew facts or had access to information contradicting their public statements, or (2) failed to review or check information that they had a duty to monitor. *Novak*, 216 F.3d at 308. "'[W]here plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information.'" *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 196 (2d Cir. 2008) (quoting *Novak*, 216 F.3d at 309). To meet this standard, a plaintiff must plead facts supporting the inference that defendants had access to "specific contradictory information . . . at the time they made their misleading statements." *In re PXRE Grp., Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 536 (S.D.N.Y. 2009).

Plaintiff argues that, based on (1) the confidential informants' statements, (2) the Individual Defendants' high-level corporate roles, and (3) the centrality of BlackBerry devices to RIM's operations, the Individual Defendants *must* have been aware of the product and production problems plaguing RIM or that they recklessly ignored them. (CAC ¶ 153.) However, for the following reasons, each of Plaintiff's arguments fails.

i. Confidential Informants' Statements

Plaintiff "largely follows a pleading strategy of publishing large block quotes from Defendants' financial disclosures and press [releases], and alleging that they were false and misleading because they omitted information later contained in" Defendants'

subsequent disclosure statements. *See Mechel OAO*, 811 F. Supp. 2d at 870. Not surprisingly, Plaintiff thus fails to provide support for the contention that Defendants had access to *specific* contradictory information *at the time* the allegedly fraudulent statements were made, such as an internal report or tracking system available to the Individual Defendants, or contradictory communications authored by the Individual Defendants.

Instead, Plaintiff marshals evidence from eleven low-level, confidential informants to loosely establish that a general atmosphere of delay and lackluster delivery existed at RIM. The informants attest to the existence of frequent status meetings where higher-level officials would learn of product delays (CAC ¶ 144), the common occurrence of such delays (*id.* ¶¶ 142–53), specific instances of QNX and PlayBook delays (*id.* ¶¶ 143, 146, 149–52), and knowledge of carrier dissatisfaction and encroaching competition (*id.* ¶¶ 142, 144–48). But these statements, though damaging to a claim of managerial competence, do not support a strong inference of reckless disregard for the truth.

First, Plaintiff admits that the informants never mentioned the Individual Defendants nor tied them personally to knowledge of the delays and product concerns. (*Id.* at ¶ 153.) Plaintiff attempts to account for this deficiency by arguing that

> [a]lthough the [confidential informants] do not expressly mention the Individual Defendants, the only plausible inference is that RIM's significant undisclosed problems, as discussed herein, were so serious and pervasive (as they were known by everyone else at the Company) that the Individual Defendants, who were

all senior management, either knew about them, or recklessly ignored and failed to inform themselves of the problems everyone else at the Company knew about.

(*Id.*) However, contrary to Plaintiff's claim, the "absence of [direct] communication undermines the inference that Defendants recklessly disregarded the truth." *Wachovia*, 753 F. Supp. 2d at 352. Indeed, "Plaintiff points to no case in which a court in this [d]istrict has inferred a 'top executive's' 'access' to contrary facts based on the expression of 'concerns' from one employee to another." *PXRE*, 600 F. Supp. 2d at 538.

Plaintiff contends that *PXRE* and *Wachovia* are inapposite in this matter because they are factually distinguishable. For example, Plaintiff argues that, in *PXRE*, scienter hinged on whether one individual's concerns were ever communicated to a defendant, and in *Wachovia*, the informants' statements were "not factual, but riddled with unsupported legal conclusions" about the alleged fraud. (Pl.'s Opp. 25 n.18.) Plaintiff's argument, however, ignores the core finding in both cases: namely, that mere assertions that defendants *must* have been aware of informants' concerns are insufficient to establish that defendants *were* aware of those concerns. Such allegations simply do not establish reckless disregard or scienter.

Further, as alleged in the CAC, the informants fail to indentify definite periods of time – and often any time period whatsoever – for when alleged events occurred, and frequently fail to specify which RIM operations were the subject of their allegations. (*See* Pl.'s Opp. 23–24 (summarizing informants' statements).) For example, CI #2 states that high-level status meetings would begin for products

approximately two years before their expected launch, and that concerns such as delays would be discussed at these meetings. (CAC ¶ 144.) However, CI #2 does not tie these statements to specific allegations in the CAC by stating what products were discussed at the meetings or when the meetings occurred relative to Defendants' statements. Likewise, though the allegations are replete with claims of carrier dissatisfaction, nowhere do the informants support Plaintiff's assertion that Defendants misled investors as to the expected carrier partners for the PlayBook, by stating either that carriers were disappointed by the tablet or had declined to carry it prior to Defendants' statements. (*See* CAC ¶ 150.) Additionally, though it is clear from the informants' allegations that QNX missed target release dates, it is not clear from those statements that the Individual Defendants would have or should have known that QNX would not be released on BlackBerry handsets in 2011. For example, CI #5 merely states that, by QNX's second target date in 2011, carriers "did not trust RIM." (CAC ¶ 146.) Plainly, this is not sufficient to support the inference that Defendants were aware that QNX would miss its 2011 release date. Finally, though the informants allege a number of problems with the PlayBook's launch, they nowhere specify that these concerns were apparent to management *prior* to the PlayBook's launch or the announcements immediately preceding the launch. *See Wachovia*, 753 F. Supp. 2d at 352 (rejecting allegations that "effectively require[d] the Court to reconstruct the chronology of Class Period allegations in order to decipher what Defendants knew or should have known on the date of a particular statement").

In short, the informants' allegations of delay and dissatisfaction largely predate the Class Period and were apparently true even

17

during the period of RIM's unprecedented growth. For that reason, and because Plaintiff "should, but [does] not, provide specific instances in which Defendants received information that was contrary to their public declarations," *Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce*, 694 F. Supp. 2d 287, 299 (S.D.N.Y. 2010), the information provided by the confidential informants does not support a strong inference of scienter.

### ii. Position-Based Inferences

Perhaps in recognition of his lack of specific facts suggesting scienter, Plaintiff relies on the allegation that, "[b]ecause of their positions with RIM, the Individual Defendants had access to non-public information . . . and present and future business prospects. . . . Because of their possession of such information, the Individual Defendants knew or recklessly disregarded the fact that adverse facts . . . had not been disclosed to, and were being concealed from, the investing public." (CAC ¶ 27.) Plaintiff also argues that the inference of scienter is not based solely on the Individual Defendants' positions, but also on the fact that those positions required them to review and sign SEC filings and related documents. (Pl.'s Opp. 22.)

However, it is well established that "accusations founded on nothing more than a defendant's corporate position are entitled to no weight." *Mechel OAO*, 811 F. Supp. 2d at 873 (collecting cases). Further, "legal obligations do not establish that the Individual Defendants were actually privy to, or failed to monitor, specific statements or reports contradicting their public statements." *Id.* (citing *In re Sotheby's Holdings, Inc.*, No. 00 Civ. 1041 (DLC), 2000 WL 1234601, at *7 (S.D.N.Y. Aug.

31, 2000)). Accordingly, Plaintiff's position-based allegations also fail to support an inference of scienter.

### iii. "Core Operations" Inference

Finally, Plaintiff attempts to rely on the "core operations" inference to support his allegations of scienter, citing *In re Reserve Fund Sec. & Deriv. Litig.*, 732 F. Supp. 2d 310, 322–23 (S.D.N.Y. 2010) and *In re Dynex Capital Inc. Sec. Litig.*, No. 05 Civ. 1897 (HB), 2009 WL 3380621, at *15 (S.D.N.Y. Oct. 19, 2009). Under this theory, which is itself a variant of the position-based theory of scienter, "if a plaintiff can plead that a defendant made false or misleading statements when contradictory facts of critical importance to the company either were apparent, or should have been apparent, an inference arises that high-level officers and directors had knowledge of those facts by virtue of their positions with the company." *Atlas*, 324 F. Supp. 2d at 489 (citing *Cosmas v. Hassett,* 886 F.2d 8, 13 (2d Cir. 1989)). In other words, "knowledge of the falsity of a company's . . . statements can be imputed to key officers who should have known of facts relating to the core operations of their company that would have led them to the realization that the company's . . . statements were false when issued." *Id.* at 490. Accordingly, Plaintiff alleges that, because mobile devices made up a substantial portion of RIM's revenues, the "only plausible inference is that Defendants knew every aspect of the chain of events in the development of RIM's products and were aware of all significant business and operational developments at the [c]ompany considering these products were pivotal to the [c]ompany's future financial success." (CAC ¶ 136.)

As an initial matter, this Court has carefully considered the continued viability

of the "core operations" inference in light of the PSLRA's heightened pleading requirement and found it lacking. *See Mechel OAO*, 811 F. Supp. 2d at 872 (discussing, *inter alia*, *In re Reserve Fund*, 732 F. Supp. 2d 310, and *In re Dynex*, 2009 WL 3380621). The Second Circuit declined to reach the question in affirming the ruling. *Frederick v. Mechel OAO*, 475 F. App'x 353 (2d Cir. 2012). Thus, the Court maintains that while the inference may be considered "as part of [a court's] holistic assessment of the scienter allegations," it is not "independently sufficient to raise a strong inference of scienter." *Mechel OAO*, 811 F. Supp. 2d at 872.

Here, Plaintiff's argument relies entirely on the centrality of BlackBerry devices to RIM's operations. Put another way, any knowledge the Individual Defendants may have had concerning the PlayBook and QNX delays, deficient product pipelines, and resource constraints is premised solely on the fact that BlackBerry devices provided 80.2% of RIM's fiscal year 2011 revenue. (CAC ¶ 42.) However, without more to tie the Individual Defendants to specific information contradicting the substance of their statements, this allegation too is insufficient to give rise to a strong inference of scienter.

c. Inference of Scienter Under *Tellabs*

Ultimately, the Court must evaluate "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 323. "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324. Here, two inferences are available: either

Defendants were aware or recklessly failed to realize that their statements understated RIM's serious deterioration, or, in the alternative, Defendants' statements, though potentially misleading, resulted from misplaced optimism or sloppy management, or both. Individually, Plaintiff's allegations are too thin a reed to support the first inference: Plaintiff's alleged motives fall far short, the confidential informants never connect Defendants to knowledge or awareness of RIM's failings, and the Individual Defendants' executive positions, along with the core operations inference, cannot in isolation support an inference of knowledge.

Even read together, Plaintiff's allegations amount to nothing more than non-actionable grievances. For example, Plaintiff alleges that Defendants should have revealed that QNX would be delayed. However, Plaintiff provides *no* evidence that Defendants were aware of QNX delays when they predicted a 2011 release. Further, Plaintiff lambasts Defendants' glowing fourth quarter projections in December 2010. However, Plaintiff not only provides no evidence to undercut the projections, but RIM's numbers were, in large part, actually proven correct in March 2011. Moreover, Plaintiff claims that Defendants were required to disclose that RIM's aging product line and resource constraints would result in a lower ASP, but Plaintiff pleads no facts to indicate that Defendants were cognizant of these concerns prior to their disclosure in March and April 2011, when Defendants acknowledged that, "This [lower] guidance range reflects a mix shift in handset towards lower ASP products in the first quarter and an increased level of investment in Research and Development and Sales and Marketing related to our tablet and platform initiatives." (CAC ¶ 72.) Put simply, Plaintiff provides no facts suggesting that

19

Defendants knowingly misled investors on these subjects.

Of course, despite asserting the foregoing allegations, Plaintiff allowed at oral argument that this litigation is, in fact, "about the PlayBook."[8]  But Plaintiff fails to state a claim even concerning RIM's tablet. Defendants unquestionably spoke of the PlayBook enthusiastically months before its launch.   However, it was not until the PlayBook was launched in April 2011 that consumers and industry experts determined that the product's core deficiencies – that is, its lack of native e-mail, contacts, and calendars – would render it a second-tier tablet. Moreover, weeks before the launch, Defendants as much as admitted that the PlayBook was lacking when RIM acquired technology to upgrade its software. Additionally, much of the information allegedly withheld was in fact difficult to know prior to the PlayBook's launch.  For instance, Plaintiff offers no facts to suggest that Defendants knew a portion of the tablets would need to be recalled.  Similarly, given the volatility of product launches, there is no reason to believe that Defendants were aware that specific providers would not carry the PlayBook when Defendants released their "expected" list of partners. Once again, Plaintiff fails to offer any evidence that Defendants were privy to contradictory material information at the time they spoke optimistically about the PlayBook or that they knowingly misled investors.[9]

Accordingly, though Plaintiff argues that the allegations in the CAC weave a portrait of a company in turmoil, where executives had grown accustomed to "over-promis[ing] and under-deliver[ing]" (CAC ¶ 142), the CAC as a whole simply does not support the conclusion that Defendants possessed the requisite fraudulent intent.[10]   Put another way, the Court finds that Plaintiff has failed to plead facts giving rise to an inference of scienter "at least as compelling" as the more obvious, and less sinister, conclusion – that Defendants simply miscalculated and poorly

---

[8] *See, e.g.*, Tr. at 15:23-25 ("Let's begin by talking about the PlayBook, because . . . the case is about the PlayBook.").

[9] RIM ultimately took a $485 million write-down on its PlayBook inventory.   Plaintiff argues that the magnitude of this write-down is itself evidence of scienter.  (*See* CAC at ¶131; Pl.'s Opp. at 27 n.22.) However, Plaintiff's cited support is factually inapposite.  In the first case, the defendants made a "dramatic" correction to earnings statements issued

*during* the class period, *Atlas*, 324 F. Supp. 2d at 488–89, and in the second, the defendants took a write-down for merchandise returns that were also made but concealed *during* the class period, *Scholastic*, 252 F.3d at 77.  In contrast, Plaintiff here pleads no facts supporting an inference that Defendants' were aware of the need for a write-down *during* the Class Period.   Indeed, the event precipitating the write-down – PlayBook's $300 drop in price – occurred nearly one year after the close of the Class Period.  (CAC at ¶ 132.)  Thus, contrary to Plaintiff's assertion, the subsequent write-down is not evidence of a knowing fraud committed during the Class Period.   Instead, it serves only as further evidence of RIM's business errors, which, while serious, are neither fraudulent nor actionable.

[10] To avoid this finding, Plaintiff relies on a Seventh Circuit case in which the court held that the defendants' motive to insulate their company's stock price along with the defendants' executive roles at the company gave rise to an inference of scienter when the defendants overstated the prospects for the company's key product. *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008). However, the case is inapplicable to the instant action.  First, its reasoning relies on the "core operations" inference that courts in this district have rejected as insufficient to meet the PSLRA's heightened pleading bar.   Moreover, that case concerns a product that was on the market at the time the challenged statements were made.  As such, there was reason to believe that the defendants praised the product's sales knowing their statements to be false. Conversely, the products at issue here were not yet on the market when the challenged statements were made, and Plaintiff pleads no facts to suggest that Defendants were then aware of the slack demand their products would one day encounter.

executed on the development of new products in a fast-moving and highly competitive industry. While a serious shortcoming in the management of a multi-billion dollar company, such deficiencies do not suggest, much less compel, an inference that Defendants acted with an intent "to deceive, manipulate, or defraud." *ECA*, 553 F.3d at 198 (quoting *Tellabs*, 551 U.S. at 313). The Court therefore concludes that Plaintiff's purported inference of scienter is not sufficiently "strong" for purposes of the PSLRA, as it is not "as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324.

### 2. Alleged Material Misrepresentations or Omissions

In addition to scienter, a plaintiff bringing a claim for securities fraud pursuant to Section 10(b) and Rule 10b-5 must adequately plead a material misrepresentation or omission by the defendant. *See, e.g.*, *Stoneridge Inv. Partners, LLC*, 552 U.S. at 157. Here, Plaintiff alleges numerous examples of both material misrepresentations and omissions. None of those examples, however, is sufficient to state a claim for fraud. Each of the alleged omissions fails because the information at issue was, in fact, disclosed or, if it was not, Defendants had no duty to disclose it. Similarly, each of the alleged misrepresentations fails because it was not, in fact, a misrepresentation or, even if it was, it nevertheless was immaterial.

### a. Omissions

At the heart of this case is Plaintiff's claim that Defendants' positive statements about the PlayBook were materially misleading. (*See* Tr. at 15:23–25; CAC ¶¶ 58(d), 67(a)–(b), 69(a)–(b), 71(a)–(b), 80(a), 113–14.) Specifically, Plaintiff asserts that RIM hyped its tablet as a market-leader while failing to disclose that the PlayBook lacked basic functions that even older model BlackBerries featured, such as native email, contacts, calendaring, and cellular capabilities.

An omission is actionable under Section 10(b) only where there is a duty to disclose the information at issue.[11] *See Thesling v. Bioenvision, Inc.*, 374 F. App'x 141, 143 (2d Cir. 2010) ("'For an omission to be actionable, the securities laws must impose a duty to disclose the omitted information.'" (quoting *Resnik v. Swartz*, 303 F.3d 147, 154 (2d Cir. 2002))). A duty to disclose a fact arises when "there is a substantial likelihood that a reasonable person would consider it important in [making investment decisions]." *Azrielli v. Cohen Law Offices,* 21 F.3d 512, 518 (2d Cir. 1994). However, a company is not required to disclose every fact that "'a reasonable investor would very much like to know.'" *City of Roseville Emps.' Ret. Sys. v. Nokia Corp.*, No. 10 Civ. 967 (GBD), 2011 WL 7158548, at *8

---

[11] Plaintiff pins much of his argument on the assertion that RIM had an affirmative duty to disclose in SEC filings any "known trends or uncertainties that . . . [RIM] reasonably expects will have a material . . . impact" on RIM's financial outlook. (CAC at ¶ 51 (citing Item 303, 17 C.F.R. § 229.303(a)(3)(ii)).) However, courts in this district have held that a violation of Item 303's stricter materiality standard cannot itself give rise to a private cause of action pursuant to Section 10(b), as opposed to actions pursuant to Sections 11 or 12. *In re Quintel Entm't, Inc. Sec. Litig.*, 72 F. Supp. 2d 283, 293 (S.D.N.Y. 1999). Further, Plaintiff's allegations do not amount to a "trend" under Item 303. For example, RIM warned of a move toward lower ASP in March 2011, prior to any negative impact on profits. Thus, it is unclear how Defendants would have "reasonably expect[ed]" a negative impact prior to that date. Additionally, all of the cited statements were made *before* the PlayBook was released. Thus, there was no "trend" to disclose regarding the tablet. Accordingly, the Court's analysis with respect to materiality will focus only on the limited disclosure obligation imposed by section 10(b).

(S.D.N.Y. Sept. 6, 2011) (quoting *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993)). Rather, "[t]he question is whether such information was necessary in light of the context, manner of presentation, and language of the statements at issue 'so that what was revealed would not be so incomplete as to mislead.'" *Id.*

Here, as an initial matter, the factual premise of several of Plaintiff's allegations is unsound. Defendants *did* make disclosures about the PlayBook's limitations – for instance, Balsillie stated in the December 2010 call that the PlayBook would be "Wi-Fi only." (Musoff Decl. Ex. G.) While this disclosure may have only scratched the surface of the PlayBook's inadequacies, it moots one of Plaintiff's main complaints – that RIM did not disclose that initial PlayBooks would lack cellular capabilities.

None of Defendants' remaining statements about the Playbook gave rise to a duty to disclose the defects in its design or production. First, the majority of Defendants' cited statements are too vague and inconsequential to give rise to any duty to disclose. (*See, e.g.*, CAC ¶¶ 67(b) (claiming that "[i]nitial feedback about the BlackBerry PlayBook has been outstanding"), 80(a) (stating that the "launch of the PlayBook will be the most significant development for RIM since . . . the launch of the first BlackBerry").) Second, to the extent Defendants praised the Playbook, they did so in general terms (*see, e.g.*, CAC ¶¶ 67(a) ("true multitasking, HD multimedia, [and] advanced security features"), 69(a) ("ultra-portable design"), 69(b) ("consumer-friendly experiences"), 71(b) ("very powerful hardware")) that did not create any legal duty to catalog the Playbook's potential shortcomings, particularly since their praise largely

matched reviewers' appraisals (*see id.* at ¶¶ 94–97); *City of Roseville*, 2011 WL 7158548, at *9.

Moreover, Plaintiff has failed to allege sufficient facts regarding the existence and timing of Defendants' knowledge of defects to give rise to a duty to disclose. That is, Plaintiff nowhere pleads facts supporting the inference that, at the time of their statements, Defendants were aware of information contradicting their statements regarding the PlayBook's type and number of applications, the technical difficulties that would plague the tablet post-launch, or which carriers would initially partner with RIM on the PlayBook. Because "[i]t is well established that securities laws do not impose a duty on corporate officials to be clairvoyant," these claimed omissions are not actionable. *Mechel OAO*, 811 F. Supp. 2d at 874.

Plaintiff also alleges that Defendants failed to disclose matters related to RIM's overall production line. Again, however, those allegations fail to state actionable omissions. For instance, Plaintiff alleges that Defendants should have disclosed that resource constraints caused by RIM's simultaneous work on new smartphones, QNX, and the PlayBook disrupted RIM's production ability, resulting in decreased shipments of BlackBerry smartphones and lower profit from the older devices on the market. (*Id.*) However, Defendants did disclose that information in March 2011 when RIM stated that its lower projections reflected "a mix shift in handset towards lower ASP products in the first quarter and an increased level of investment in Research and Development and Sales and Marketing related to our tablet and platform initiatives." (CAC ¶ 72.) Additionally, Plaintiff argues that Defendants were required to disclose that RIM's "existing

22

product line was aging and [RIM] could not timely introduce new products to the market." (*See, e.g.*, CAC ¶ 56(a)(i).) However, the age of RIM's product line and RIM's growing inability to introduce new products were not only reported in articles cited by the Plaintiff in the CAC (*see* CAC ¶ 65), but were also available to any customer who walked into a Sprint, Verizon, or AT&T store. As a "matter[] of general public knowledge," this claimed omission is thus not material. *In re Fuwei Films Sec. Litig.*, 634 F. Supp. 2d 419, 436 (S.D.N.Y. 2009). Finally, Plaintiff scatters throughout the CAC allegations that Defendants failed to disclose that "RIM was still far away from a blockbuster product" and that "with no QNX on handsets until 2012, RIM would continue to lose market share to its competitors." (*See, e.g.*, CAC ¶¶ 80(a)–(b).) However, Plaintiff provides no facts to support Defendants' knowledge of the future popularity of its prototypes or impact of QNX delays. Further, Plaintiff points to no duty, nor is the Court aware of one, that would require Defendants to disclose such prognostications.

### b. Misrepresentations

Plaintiff's allegations of misrepresentations by Defendants fail for reasons similar to those that undermined Plaintiff's allegations of omissions.

To begin with, several of Defendants' statements that Plaintiff argues were misrepresentations in fact were true. For example, Plaintiff challenges a number of Defendants' financial projections as misleading. Specifically, Plaintiff alleges that Defendants' projections for the fourth quarter of fiscal year 2011 – 14.5–15 million units shipped, revenue of $5.5–$5.7 billion, and gross margins similar to those in the third quarter – were false and misleading. (CAC ¶ 61(a)(b).) However, the fact that a

majority of these predictions were correct easily defeats that claim. *In re IAC/InterActiveCorp Sec. Litig.*, 478 F. Supp. 2d 574, 587 (S.D.N.Y. 2007) ("[T]he fact that [the defendant corporation] reported earnings . . . within the projected range [] largely eviscerates any unstated claim that the earnings projection was false or misleading."). In the fourth quarter, RIM shipped 14.9 million units, generated revenue of $5.6 billion, and achieved a gross margin above that of the third quarter. (Musoff Decl. Exs. C, E.)

Defendants' statements about their past financial results are not actionable for the same reason. "Accurate statements about past performance are self-evidently not actionable under the securities laws." *Nadoff v. Duane Reade, Inc.*, 107 F. App'x 250, 252 (2d Cir. 2004); *see also In re Duane Reade Inc. Sec. Litig.*, No. 02 Civ. 6478 (NRB), 2003 WL 22801416, at *6 (S.D.N.Y. Nov. 25, 2003) ("[D]efendants may not be held liable under the securities laws for accurate reports of past successes, even if present circumstances are less rosy."). Because Plaintiff never alleges that Defendants' statements regarding RIM's financial results – including those regarding RIM's quarterly earnings and relative market share in Europe and Latin America – were inaccurate, those statements do not create actionable misrepresentations. (*See, e.g.*, CAC ¶¶ 56(a), 56(c), 58(a)–(b), 62, 73(a), 78.)

Plaintiff's remaining allegations of misrepresentations fail on materiality grounds. A statement is material where "a reasonable investor would have viewed it as significantly altering the 'total mix' of information available." *SEC v. Mayhew,* 121 F.3d 44, 52 (2d Cir. 1997). Thus, "[a]t the pleading stage, a plaintiff satisfies the materiality requirement . . . by alleging a

statement or omission that a reasonable investor would have considered significant in making investment decisions." *Ganino v. Citizens Utils. Co.,* 228 F.3d 154, 161–62 (2d Cir. 2000) (citing *Basic Inc. v. Levinson,* 485 U.S. 224, 231 (1988)).  Indeed, it bears noting that "[c]ourts do not grant motions to dismiss pursuant to [Federal Rule of Civil Procedure] 12(b)(6) on grounds of immateriality, unless the misstatements 'are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.'" *In re JP Morgan Chase Sec. Litig.,* 363 F. Supp. 2d 595, 625–26 (S.D.N.Y. 2005) (quoting *Ganino,* 228 F.3d at 162).

As a subset of such "obviously unimportant" statements, courts have recognized two categories of statements that are immaterial as a matter of law.  Broadly speaking, those categories are (1) puffery and (2) forward-looking statements that bespeak caution.  Puffery is defined as a "company's statements of hope, opinion, or belief about its future performance or general market conditions." *In re Duane Reade Inc.*, 2003 WL 22801416, at *6 (citing *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 811 (2d Cir. 1996)).  It is well-established that puffery is "not actionable under the securities laws." *Id.*  This is because "[u]p to a point, companies must be permitted to operate with a hopeful outlook." *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004); *see also Novak*, 216 F.3d at 315.  Opinions may be actionable, however, if they are "worded as guarantees" or "the speaker does not genuinely or reasonably believe them." *In re Int'l Bus. Mach. Corporate Sec. Litig.*, 163 F.3d 102, 107 (2d Cir. 1998).

The "bespeaks caution" doctrine provides further protection for forward-looking statements.[12]  Under this doctrine, "alleged misrepresentations in [a corporate communication] are immaterial as a matter of law [if] it cannot be said that any reasonable investor could consider them important in light of adequate cautionary language set out in the same [communication]."[13] *Halperin v. Ebanker USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002).  In analyzing disclosures containing cautionary language, a court must review the document or statement in its "entirety to determine whether a reasonable investor would have been misled.  The touchstone of the inquiry is not whether isolated statements within a document were true, but whether [the misstatements or omissions] . . . would affect the total mix of information and thereby mislead a reasonable investor regarding the nature of the securities offered." *Rombach*, 355 F.3d at 173.

Here, Plaintiff alleges that Defendants' statements concerning RIM's projected outlook – including expected financial results, plans to improve market share, new product releases, and planned carrier

---

[12] The doctrine applies only to forward-looking statements and does not extend to knowingly made misstatements. *P. Stolz Family P'ship L.P. v. Daum*, 355 F.3d 92, 97 (2d Cir. 2004).

[13] The PSLRA's safe-harbor provision for forward-looking statements protects from liability "statement[s] of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer" and "statement[s] of future economic performance," so long as a statement is (1) identified as forward-looking and accompanied by meaningful cautionary language, (2) immaterial, or (3) made without knowledge that the statement is false and misleading.  15 U.S.C. § 78u-5; *Slayton v. Am. Express Co.*, 604 F.3d 758, 765–66 (2d Cir. 2010).  Though facially applicable, the parties agreed at oral argument that the statutory safe-harbor does not apply to Defendants' statements due to a prior consent order entered into by RIM.  (*See* Tr. 14:8–20.)

pairings – were misrepresentations. (*See* CAC ¶¶ 56(b), 56(d), 58(c), 58(e)–(f), 61(a)–(c), 63–64, 73(a)–(b), 76, 80(b)–(c), 81–83, 90–91, 93(a)–(b), 99(a)–(b), 102–05). Those statements, however, were either puffery or forward-looking statements that bespoke caution, and thus they are not actionable. First, Plaintiff points to a number of statements that were clearly hype that was unlikely to spur investor reliance. For instance: "we are setting the stage for continuing success" (*id.* at 56(b)); "I feel very, very good about [the] U.S." (*id.* at 58(e)); "we're laying in the pieces here to sustain really exciting growth" (*id.* at 58(f)); "[w]e are laying a strong foundation for RIM's expanding market opportunity" (*id.* at 73(a)); "[w]e don't see the Q1 decline in sequential earnings per share as a beginning of a trend but rather as a period of transition" (*id.* at 76); we are "bullish" (*id.* at 80(b)); and "these new products, . . . they're phenomenal" (*id.* at 80(c)). Such comments are simply too vague to be considered misleading. Rather, they are non-actionable corporate puffery.

Second, investors were provided with substantial warnings that RIM's financial projections and other forward-looking statements, such as planned product launches and carrier partners, could be impacted by unforeseen circumstances. This cautionary language covered, *inter alia*, "RIM's ability to enhance current products and develop new products and services," "risks related to delays in new product launches," and the fact that RIM "may not be successful in its attempt to enter the tablet market." (Defs.' Mem. 27.) Defendants additionally cautioned that RIM's "inability, for technological or other reasons, to enhance, develop and introduce products and services in a timely manner, or at all, in response to changing market conditions or customer requirements could have a material

adverse effect on [RIM's] business, operating results and financial condition or could result in its products and services becoming obsolete." (*Id.*) No reasonable investor would read RIM's projections as certitudes when confronted with such warnings. The statements are thus not actionable under the bespeaks caution doctrine.

Plaintiff responds that Defendants' statements were not solely forward-looking because they referenced RIM's past and current success, and are therefore not subject to protection under this doctrine.[14] *See Darquea v. Jarden Corp.*, No. 06 Civ. 0722 (CLB), 2007 WL 1610146, at *7 (S.D.N.Y. May 31, 2007). However, that argument is unavailing. First, mixing projections with statements of present fact does not deprive the former of protection under the bespeaks caution doctrine. Second, to the extent Defendants' statements concerned present facts – such as Defendants' assertion of "growing excitement from our partners and customers around upcoming smartphone, tablet, software and service offerings" – they paralleled almost precisely statements found to be too vague to give rise to liability. *See, e.g.*, *San Leandro*, 75 F.3d at 806, 811 (finding statement that "business is strong and growing" to be non-actionable). Put simply, "[n]o reasonable investor could have been misled from these disclosures into thinking that the risks of new products delays and competitive markets did not actually exist or could not have adverse effects" on RIM's financial results. *City of Roseville*, 2011 WL 7158548, at *5.

---

[14] For instance, the December 2010 release stated that "with strong results and momentum from our recent product introductions, as well as growing excitement from our partners and customers around upcoming smartphone, tablet, software and service offerings, we are setting the stage for continuing success." (CAC at ¶56(b).)

Accordingly, the Court concludes that Defendants' statements projecting RIM's financial and product outlook are not actionable.

\*     \*     \*

In sum, although the Court could, of course, dismiss the CAC based on Plaintiff's failure to plead scienter alone, the Court finds that Plaintiff's claimed misstatements and omissions fall short of the above-stated criteria, and thus Plaintiff's failure to plead material misrepresentation on the part of Defendants constitutes a separate basis for dismissing the CAC.

### B.  Section 20(a) and (b) Claims

In order to establish a *prima facie* case of liability under Section 20(a) and (b), a plaintiff must show a primary violation of securities law by a controlled person. 15 U.S.C. § 78t(a)–(b). Because Plaintiff has failed to plead a primary violation under Section 10(b), Plaintiff's Section 20(a) and (b) claims must likewise fail.

### C.  Leave to Amend CAC Pursuant to Federal Rule of Civil Procedure 15(a)(2)

Plaintiff requests leave to amend the CAC in the event that the motion to dismiss is granted. (Pl.'s Opp. 30.) However, Plaintiff has already been permitted the opportunity to amend through the filing of the CAC. Further, Plaintiff provides no indication of the substance of his contemplated amendment. "At the very least, a party seeking leave to amend must provide some indication of the substance of the contemplated amendment in order to allow the Court to apply the standards governing Rule 15(a)." *DeBlasio v. Merrill Lynch & Co., Inc.*, No. 07 Civ. 318 (RJS), 2009 WL 2242605, at \*41 (S.D.N.Y. July 27, 2009) (citing *Horoshko v. Citibank,*

*N.A.*, 373 F.3d 248, 249 (2d Cir. 2004)). "In the absence of any identification of how a further amendment would improve upon the [c]omplaint, leave to amend must be denied as futile." *In re WorldCom, Inc. Sec. Litig.*, 303 F. Supp. 2d 385, 391 (S.D.N.Y. 2004); *see also Lucente v. Int'l Bus. Mach. Corp.*, 310 F.3d 243, 258 (2d Cir. 2002)). Thus, the Court is without basis to determine whether an amended complaint would itself withstand a Rule 12(b)(6) motion. Further, given that four complaints have already been filed in this action – those in the initial putative class actions as well as the CAC – the Court is persuaded that additional attempts at amendment would be fruitless. Plaintiff's request is therefore denied.

### IV.  CONCLUSION

It is plain from the CAC as well as RIM's financial trajectory over the past two years that Defendants have failed to keep pace with their rivals in the highly competitive market for smartphones and information technology. As a consequence, Defendants have paid a price for their mistakes by way of demotions, terminations, and sizable financial setbacks. Nevertheless, corporate failings alone do not give rise to a securities fraud claim. Here, the facts alleged by Plaintiff support a finding of corporate mismanagement, not misfeasance. Accordingly, and for the reasons stated above, the Court finds that Plaintiff has failed to plead scienter and materiality under the Exchange Act as to the alleged misstatements and omissions. The Court thus grants Defendants' motion to dismiss the CAC with prejudice. The Clerk of the Court is respectfully directed to terminate

26

the motion pending at Doc. No. 40 and to close this case.

SO ORDERED.

_____
RICHARD J. SULLIVAN
United States District Judge

Dated: March 28, 2013
      New York, New York

*   *   *

Plaintiff is represented by David A.P. Brower of Brower Piven, 488 Madison Avenue, New York, New York 10022.

Defendants are represented by Jay B. Kasner, Jessica Anne Barcus, and Scott D. Musoff of Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, 42nd Floor, New York, New York 10036.

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3-29-13